J. Smith McMaster, Appellant, *v.* The State of New York, Respondent.

Contracts made under and in pursuance of the act of 1870 (Chap. 378, Laws of 1870), organizing "the Buffalo State Asylum for the Insane" for furnishing materials for the construction of buildings, were not abrogated by the provisions in the appropriation bills of 1874 and 1875 (Chap. 323, Laws of 1874, and chap. 264, Laws of 1875) in reference to that institution.

Accordingly *held,* where a claim against the State for damages for breach of contracts for furnishing building materials was presented more than six years after the passage of the act of 1875, but within six years after breach of the contracts on the part of the officials having charge of the work, that the claim was not barred by the statute of limitations.

(Argued June 17, 1886; decided December 7, 1886.)

Appeal from a decision of the Court of Claims rendered February 12, 1885, dismissing a claim against the State and awarding to the claimant nothing thereon.

The nature of the claim and the facts material to the questions discussed are stated in the opinion.

*J. F. Parkhurst* for appellant. The contracts were not abrogated by either chapter 323 of the Laws of 1874, or chapter 264 of the Laws of 1875; nor was the passage of either of those laws a breach of the contracts on the part of the State. (*People* v. *Zoll*, 97 N. Y. 203; *In re Folsom*, 56 id. 60; *Roper* v. *Johnson*, 4 Moak's Eng. Rep. 297; *Frost* v. *Knight*, L. R., 7 Exch. 111; *Freer* v. *Denton*, 61 N. Y. 496; *Shaw* v. *Rep. Life Ins. Co.*, 69 id. 292; *Scofield* v. *Mc-Gregor*, 63 id. 638; *Howard* v. *Daly*, 61 id. 362.) If by either of these statutes the contracts were abrogated, they were ratified and reinstated by the subsequent acts of the State, and were binding upon the State when the plans were changed in May, 1876. (*Corkings* v. *The State*, 99 N. Y. 499; *People* v. *Stephens*, 71 id. 527; *State of Ill.* v. *Delafield*, 8 Paige, 526; 2 Hill, 150, 175, 177; 26 Wend. 192.) When a State engages in trade or makes contracts, it must for most purposes be regarded in the same light as an individual. (2 Hill, 176; *U. S. Bk.* v. *Planters' Bk.*, 9 Wheat. 904.)

*Denis O'Brien*, attorney-general, for respondent. Chapter 323, Laws of 1874, and chapter 264, Laws of 1875, superseded the original act of 1870 (Chap. 378), abrogated all contracts entered into by virtue of its provisions and constituted a breach thereof on the part of the State. (*Lord* v. *Thomas*, 64 N. Y. 107; *Danolds* v. *State*, 89 id. 35; *Graves* v. *White*, 87 id. 463–6.) The designation of certain agents and methods for the doing of an act implies an exclusion of all other agents and methods. (*Sanders* v. *Franklin St. M. E. Church*, 97 N. Y. 119; *Dickinson* v. *City of Poughkeepsie*, 75 id. 65.) These laws were notice to the contractors of the rescission of the contracts, and that any further work done thereunder would be illegal. For

any subsequent work they could recover neither on the contract nor on a *quantum meruit*. (*Dickinson* v. *City of Poughkeepsie, supra; McDonald* v. *Mayor*, etc., 68 N. Y. 23.) The contracts having been abrogated nothing but an act of the legislature in direct terms could revive or continue them in force. (*State of Illinois* v. *Delafield*, 8 Paige, 526 ; *Delafield* v. *State of Illinois*, 2 Hill, 159, 160 ; *People* v. *Bank of North America*, 75 N. Y. 558; *State* v. *Hastings*, 10 Wis. 526.) The claim was barred by the statute of ;limitations. (Const. of State, art. 7, § 14; Code of Civ. Pro., § 382, subd. 1.)

EARL, J. In 1870, the legislature passed the act, chapter 378, "to establish and organize the Buffalo State Asylum for the Insane." The governor was authorized to appoint, by and with the consent of the senate, ten managers for the asylum who, among other duties, were to procure plans, designs and specifications for the construction of the necessary buildings, and to contract for the construction of the same, provided such plans, designs, specifications, contracts and the terms thereof should be approved by the governor, State engineer and comptroller, and further provided that the managers should not adopt any plans for the buildings, nor alter or change the plans adopted without the assent of the State officers named. In pursuance of the act the governor appointed the managers, and they prepared plans, designs and specifications which were approved by the State officers. The plans provided for a central building, and five connecting male wards upon one side designated A, B, C, D and E, and five female wards upon the other side designated by the same letters, and several out-buildings.

The managers afterward advertised for bids for furnishing the dimension stone and block work required for the buildings, and for the cutting of the same, and the firm of Peck & Co. were the lowest bidders for such materials and work; and the managers thereupon awarded the contracts for the materials and work to that firm at the prices bid for them, and the contracts were afterward duly and formally executed. From time to time, during the years 1871, 1872, 1873, 1874, 1875, and

until the month of May, 1876, the firm furnished upon the asylum grounds dimension stone and blocks, and cut and prepared the same, and such materials were measured and accepted by the supervising architect and superintendents, and used in the construction and completion of certain of the buildings referred to in the contracts, drawings, plans and specifications. On the 25th day of May, 1876, the managers passed the following resolution : "*Resolved*, That the plans of both ends of the asylum buildings, so far as they refer to wards C, D and E, be so modified as to permit the same to be constructed of brick with sand-stone trimmings, instead of stone entirely, and that the plans, when so modified, be presented to the proper State officers for their approval as required by law." On the 7th day of July, 1876, plans in accordance with this resolution were approved by the proper State officers, and on the seventeenth day of August were finally adopted by the managers. This change in the plans was made without the consent of Peck & Co., but they furnished and cut whatever stone were required, from time to time, by the managers and building superintendent to be furnished for the construction of the buildings according to such modified plans, and received compensation in full for such materials and work. At the time of the passage of the resolution above set forth, the walls of the central building, and male wards A and B were completed according to the original plans, but the walls of the male wards C, D and E, were not then built, and they were subsequently in 1876 and 1877, prior to the fifth day of November in the last year, built according to the modified plans. At the last date the managers passed the following resolution : "*Resolved*, That the building superintendent notify Peck & Co. to remove the stone belonging to them from the asylum grounds within ten days from the time they receive such notification from the building superintendent." Such notification was given on the next day, and thereafter the contractors were not permitted to furnish more stone, or further to perform their contracts. The female wards have never been constructed, and the buildings have been recognized as completed.

In the year 1881 the claim for damages of Peck & Co. for alleged breach of their contracts on the part of the State was duly assigned to this claimant, and in the month of January, 1882, he duly executed, verified and presented to the State board of audit his petition, setting forth the particulars of his claim and praying for the allowance thereof. That petition was pending and undetermined before the board of audit and was by law transferred to the board of claims when that board was constituted in 1883.

The claim was brought to a hearing before the board of claims, and it found, among other things, that Peck & Co. sustained damages from the breach of the contract on the part of the State, but dismissed the claim on the sole ground that it was barred by the statute of limitations; and whether it was so barred or not is the sole question for our determination.

It is claimed on behalf of the State that the contracts were abrogated by the acts, chapter 323 of the Laws of 1874 and chapter 264 of the Laws of 1875, and that the breach of the contracts was not later than the date of the passage of the last act, which was more than six years before the presentation of the claim to the board of audit. On the other hand, the claimant contends that the breach which gave his assignors a cause of action was not earlier than the 25th day of May, 1876, within six years before the presentation of the claim.

The act, chapter 323 of 1874, appropriated for " the Buffalo State Asylum for the Insane, to be expended only for the completion of the buildings already commenced, the sum of $150,000." This provision in no way interfered with the contracts. It simply directed how the money thus appropriated should be used, and in no way worked a repudiation of the contracts. The act also contained the following provision : " The governor is hereby authorized to appoint two superintending builders to take charge of the following buildings in process of construction, namely : the Buffalo State Asylum for the Insane, the State Reformatory at Elmira, the Hudson River State Hospital for the Insane at Poughkeepsie, and the State Homœopathic Asylum for the Insane at Middletown, to

superintend the construction and completion thereof. The persons appointed under this provision shall be vested, so far as the construction of said buildings is concerned, with all the duties, powers and responsibilities heretofore imposed or conferred upon the commissioners or managers heretofore appointed to take care of such buildings respectively, which said commissioners and managers are hereby superseded as to the powers and duties herein referred to. The purchasing of the materials and all things connected with the erection of said buildings shall be done by contract, and all contracts shall be awarded to the lowest responsible bidder after being advertised as is now required by law for the advertising and letting of State work on the canals."

This provision did not entirely supersede the managers appointed under the act of 1870, but substituted in their stead only so far as concerned the construction of the asylum buildings two superintending builders. It did not alter the plans for the buildings, nor expressly abrogate or repudiate any contracts which the managers had entered into for the construction of the buildings. It cannot be inferred from the language used that the legislature meant to abrogate valid existing contracts, and thus leave the State liable for damages for their breach.

The contracts of Peck & Co. covered only a portion of the material and work required for the buildings, and as the act of 1870 did not require that contracts should be let at a public bidding, this act required that contracts should be so let, and all its language can have full force by confining it to future contracts. It looked to the future, and did not purport to interfere with what had already been done, with materials already purchased, or valid contracts already made in the very mode it prescribed. Suppose the contracts had been relet at a lower price, the diminished price might at least measure, though not necessarily limit, the damages of Peck & Co. caused by the breach of their contracts, and the State would gain nothing. The construction contended for on behalf of the defendant, so unjust to the contractors, and injurious to the State, should not

be adopted unless required by the plain meaning of the language used, and we think it is inadmissible.

That the statute of 1874 cannot be so construed is made more manifest by reference to the act of 1875, which, it is also contended, abrogated the contracts. Section 1 of that act provides as follows: "The governor is hereby authorized to appoint three building superintendents of practical experience who shall respectively have charge of the construction of the Hudson River State Hospital for the Insane at Poughkeepsie, and the State Homœopathic Asylum for the Insane at Middletown, and the Buffalo Asylum for the Insane. The purchasing of the materials, and all things connected with the erection of new buildings, and the labor upon the same shall be done by the managers thereof by contract, and the contracts shall be awarded to the lowest responsible bidders, after being advertised in the State papers, and in at least two papers published in the locality where the work is to be done, once in each week for four weeks consecutively immediately preceding the letting of said work, which notice of letting, to be signed by the managers, shall state the work to be let, the quantity and quality of materials to be bid for, and the length of time which will be given for the completion of the work, or the delivery of the materials, the amount of the security required, bonds to be furnished for the faithful performance of the contracts. Before said work and materials shall be advertised and let by the managers aforesaid, full detailed plans and specifications of said work shall be made and approved of by the lieutenant-governor, attorney-general and comptroller of the State, in writing; and said plans and specifications thus made and approved shall not be altered without the consent and approval, in writing, of the lieutenant-governor, attorney-general and comptroller. The contracts for such labor and materials shall be made by the managers aforesaid after the approval of the lieutenant-governor, attorney-general and comptroller, in writing, indorsed thereon, after having been furnished by the said managers with the bids for said work and materials, which shall be filed by the comptroller in his office." For the same reasons before

stated in reference to similar language use   n the act of 1874,
this section must be held to have referenc   o future contracts
in the construction of the buildings, and     its language can
have effect by confining it to such contracts  It would be quite
preposterous to suppose that the legislatu   heant by this sec-
tion to abrogate not only all the contracts   ting prior to the
act of 1874, but all the contracts let in p    iance of that act
and expressly authorized thereby; ·and ye    ..e act would have
to receive such a construction if the act of 1874 were construed
as it is claimed it should be on behalf of the defendant.    That
is, if the act of 1874 abrogated all the contracts theretofore
made, then the act of 1875 abrogated all the contracts made
before its passage.    It is plain that both acts were concerned
with the future, and had reference to future work and mate-
rials, and future contracts.

It is a fundamental rule, founded in wisdom and sound pub-
lic policy, that, unless the very plain meaning of the language
requires it, laws should not be so construed as to have retro-
spective operation, or to affect existing contracts or acts already
legally done.

This obvious construction of the two acts is one that all the
persons connected with the construction of the buildings under-
stood and acted upon.    The managers and superintending build-
ers all recognized these contracts as subsisting, and the contrac-
tors continued to perform them long after the passage of these
acts; and it does not appear that any one prior to the hearing of
this matter before the board of claims ever claimed that these
contracts were abrogated or broken by these acts.

The cases of *Lord* v. *Thomas* (64 N. Y. 107) and *Danolds*
v. *The State* (89 id. 36) are in no way in conflict with the
views here expressed.    They involved the construction and
effect, besides the provision above quoted from the act of 1874,
of the following clause therein: " For the State Reformatory,
at Elmira, the sum of $300,000, provided the plans of the
building be so changed as to render such sum sufficient to com-
plete the center building and the south wing so as to receive
convicts; such change of plans to be approved of and certified

by the governor and comptroller." A superintending builder was appointed, and the plans were so changed as to make the contract which had previously been entered into wholly inapplicable, and the contractor was absolutely prohibited from the further performance of his contract; and under such circumstances it was held that the contract had been abrogated and broken. Here the plans were not changed, and were not ordered to be changed by either of the acts, and there is nothing from which an intent to abrogate the contracts can be justly inferred.

We have reached this conclusion without considering the allegations of the claimant that the State subsequently to 1875 recognized and ratified the contracts as valid and subsisting, and also that it became estopped from denying the validity and continued existence of the contracts subsequently to that time by virtue of the judgment against it in the action brought by it against Peck & Co. to recover back money paid under the contracts.

We have confined our attention to the one point — the statute of limitations — upon which the board of claims based its decision. The case was settled and prepared to present that point alone, and it would not be proper to consider any other

In conclusion, we repeat, as peculiarly applicable to this case, what was said in *Corkings* v. *The State* (99 N. Y. 499): "When the State has no better or other defense than the statute of limitations it should at least, both upon the law and the facts, establish that defense with reasonable clearness and certainty."

The decision of the board of claims should be reversed, and a new hearing ordered, costs of this court to abide event.

All concur, except Danforth, J., dissenting, and Andrews and Miller, JJ., not voting.

Decision reversed.