TABER v. BOARD OF SUPERVISORS OF ERIE COUNTY.

(*Supreme Court, General Term, Fifth Department.* April 16, 1891.)

1. MILITARY BOUNTIES—WHO ENTITLED UNDER LAWS N. Y. 1865, Ch. 29—SUBSTITUTES.
    Plaintiff's assignors were residents and citizens of Erie county, liable to do military duty under the laws of the United States, and were properly enrolled in some one of the subdistricts into which the county was divided. Substitutes put in by them were accepted and enlisted in the United States service for the period of three years, under the call of July, 1864, and were credited on the quota under said call for the county, and went to reduce said quota, and the excess of such service, which was two years in each case, was applied on the quota assigned said county under the call of December, 1864, and went to reduce that quota. *Held*, that plaintiff's assignors were entitled to $400 apiece, with interest, to be paid by Erie county out of the funds received by said county from the state as bounties, under Laws N. Y. 1865, c. 29, providing that a bounty to that amount should be paid to any person who had furnished or should furnish an acceptable substitute to apply on the quota under the call of December 19, 1864, which substitute should be accepted by the authorities of the United States, and credited to the county in which said person should be enrolled, and which substitute should go to reduce the quota of such county. CORLETT, J., dissenting.

2. SAME—PAYMENT—BURDEN OF PROOF.
    In an action against a county to recover the bounties so paid it by the state, the persons entitled thereto need not show that they have not been paid, though they allege non-payment; such payment is a matter of defense. CORLETT, J., dissenting.

**3. SAME—PARTIES.**

The various counties, in receiving the bounty money from the state, were not the mere agents of the state for the transmission of the bounties to those entitled to them, and the latter could sue the county therefor.

**4. SAME—EVIDENCE.**

In such action, evidence of what was said and done by and between the agent of a county and the paymaster general of the state, at the time of settlement between the state and the county, and payment of the bounty money to the latter, including all papers produced by the agent for the purpose of such settlement, are admissible as part of the *res gestæ*.

Appeal from special term, Erie county.

Action by William D. Taber, as assignee of certain persons, to recover money alleged to have been received by the county of Erie from the state of New York as bounties allowed by Laws N. Y. 1865, c. 29, to persons furnishing substitutes for military service during the war. On an appeal from an order of the special term denying a motion to set aside a nonsuit, and for a new trial, the general term in January, 1881, handed down the following opinion:

"SMITH, J. The plaintiff, as the assignee of two hundred and two persons, brings this action to recover money alleged to have been received by the county of Erie from the state of New York, as bounties paid by the state on account of the excess of years of enlistment of substitutes put into the army of the United States government by the several assignors, between 27th of June and 9th of September, 1867, to apply on the quota under the call for troops of 19th December, 1864. Mr. Justice BARKER, by whom this case was tried at the circuit, and who also decided the motion for a new trial, delivered an opinion on the latter occasion, in which he stated certain facts which he regarded as sufficiently proved for the purposes of the action. An examination of the voluminous printed case satisfies us that the conclusions of the learned judge in that regard are borne out by the testimony, and therefore, for the purpose of presenting the questions in the case, we adopt his statement of facts, substantially as follows: Each of the plaintiff's assignors, so furnishing a substitute, was a resident and citizen of the county of Erie, liable to do military duty under the laws of the United States. He was properly enrolled in some one of the subdistricts into which the county was divided. The substitute put in by him was accepted and enlisted into the United States service for the period of three years, under the call of July, 1864, in pursuance of an arrangement between the substitute and the principal. Such substitute was credited on the quota under said call for some of said subdistricts, and went to reduce such quota; and the excess of such service, being two years in each case, was, under the laws and the regulations of the military department of the government, applied upon the quota assigned under the call of December, 1864, to the subdistrict in which said principals were severally enrolled, and went to reduce such quota. At special term, Judge BARKER also assumed as proved that after the passage of the act of the legislature of this state, providing for state bounties, (Laws 1865, c. 29,) and on or about the 6th of July of that year, a committee appointed by the board of supervisors of said county, and fully empowered to represent it in all business done by them as such committee, applied to the paymaster general of the state for the payment to the county of Erie of all bounties and indemnity to which it was entitled under said act, and made a claim for bounty in some one or more of said cases where substitutes had been furnished as above stated, and received from the paymaster in each case so presented the sum of four hundred dollars, and the same was paid over by the committee, and duly accounted for, and went into the treasury of the county as its funds, and were used as such. Upon this point we think the evidence goes somewhat further than the statement of the learned judge, and

warrants the conclusion that the amount claimed, received, paid over, and used by the county included the sum of four hundred dollars in the case of each of the plaintiff's assignors. We refer especially to the evidence contained in the provost-marshal's certificate and table annexed, forming part of Exhibit A, and which was presented by the committee to the paymaster. It is also to be stated that no money was paid or advanced to either of said substitutes by the county, or any other locality, and that each of said persons who so furnished substitutes has assigned to the plaintiff all claims and demands which he had against the state or the county for bounty under said act, arising out of the facts above stated.

"An important question is whether the plaintiff's assignors were entitled to a bounty under the act. Judge BARKER answered that question in the negative. In the like case of Woodward against the present defendant, Mr. Justice DANIELS came to the opposite conclusion. The judgment in that case was affirmed, but by default; and, in view of this conflict of decision, it has become our duty to examine the question *de novo*, this being the first occasion on which it has been argued in this court. The prime objects of chapter 29 of the Laws of 1865 were to provide means for filling the quota of the state, under the call of December, 1864, and all other future calls that might be made during the war then existing, and to equalize bounties. The first of those objects was plainly stated in section 1. The second section provided for the payment of a bounty to volunteers necessary to fill the quota under the call of December, 1864, or any subsequent call, and also for refunding to any town, city, or county the bounties paid by it, not exceeding the rates and sums mentioned in the act, whereby ' it shall have filled its quota required by the December call, or shall have furnished an excess of men or of years of service under the call of July, 1864, by furnishing men for one or more years, who being credited, before or since said December call, in said town, city, or county, shall have operated to relieve, in whole or in part, said town, city, or county from furnishing men under the December call.' The third section limited the bounty to volunteers to six hundred dollars to those enlisting for three years, four hundred dollars for two years, and three hundred dollars for one year, and gave a bounty to drafted men of two hundred and fifty dollars. The fourth section prohibited cities, counties, and towns from paying bounties in excess of those specified in section three, except as therein provided, and from raising money for that purpose. The fifth section was intended to prevent the payment of bounties to brokers, middlemen, or agents. Section 6, which most nearly relates to the question in hand, is as follows: 'Sec. 6. A bounty to the amount hereinbefore provided shall be paid to any person who has furnished, or who shall furnish, an acceptable substitute, to apply on the quota under the call of December 19, A. D. 1864, which substitute shall have been accepted by the authorities of the United States, and credited to the town, city, or county in which said person shall be enrolled, and which substitute shall go to reduce the quota in such town, city, or county, which bounty shall be paid under such regulations as shall be prescribed by the governor as commander in chief, under general orders. But, if any such person has received any sum from any city, county, or town, he shall receive, by virtue hereof, no more than enough to make the amount to be paid to him equal to the bounty hereby provided for.' The remaining sections of the act had no special bearing upon the question.

"The assignment of the quotas of each state, district, and subdistrict was done by the war department, through the bureau of the provost-marshal general of the United States. By act of congress, it was required that, in assigning to the districts the number of men to be furnished therefrom, consideration should be given to the number of volunteers and militia furnished by the several states in which such districts were situated, and the period of their service since the commencement of the Rebellion, and that the assign-

ment should be so made as to equalize the numbers among the districts of the several states, considering and allowing for the numbers already furnished as aforesaid, and the time of their service. 12 U. S. St. at Large, p. 731, c. 75, § 12. The president's proclamation of 18th July, 1864, calling for five hundred thousand volunteers, provided that the call should be reduced by credits for men furnished to the military service in excess of calls theretofore made. By the credits allowed on that call the number of men to be obtained under it was reduced to two hundred and eighty thousand, and, to supply the deficiency arising from that and other causes, in the number of men actually put into the service under that call, the president issued his proclamation on 19th December, 1864, calling for three hundred thousand men. The rule of equalization adopted and applied by the war department for the purpose of carrying out the requirement of congress was to multiply the number of men furnished from each district by the number of years of each man's service. The product gave the amount of years' service actually rendered, and it was that product found for each subdistrict which formed the basis of comparison for equalizing the service required from all the districts respectively. Judicial notice may be taken of the fact that under that system various localities, by enlisting men for terms of two or three years under the July call, had, before the December call issued, made up, in whole or in part, their quota under the latter call. That state of things was recognized by the legislature in adopting the act of 1865, and their intention, as we read the act, was to give the same bounty to those who had thus contributed in advance to fill the quota under the December call as was given to those who should help to fill it thereafter; and the bounty was given to persons furnishing substitutes, as well as to localities, by way of reimbursement for bounties paid by them. The county of Erie, by availing itself of the substitutes furnished by the plaintiff's assignors, who had severally enlisted for terms of three years, had more than filled its quota under the July call, and, if the construction of the act above expressed is correct, the persons so furnishing men or years of service in excess of the quota made under the July call, which went to fill the December quota, were entitled to the bounty given by the act.

"It is insisted, however, on the part of the respondent, the plaintiff's assignors were not within the sixth section of the act, because they had not furnished substitutes under the December call; that the section was not retroactive, except so far only as to include those who had furnished substitutes after the December call was issued, and before the act took effect. This seems clearly a misapprehension. The bounty is given to any person who has furnished, or who shall furnish, an acceptable substitute, not under the call, but to apply on the quota under the call of December. If the substitute was applied on that quota, it is immaterial whether he was furnished before or after the December call was made. The act is retroactive in respect to individuals within its provisions, furnishing substitutes, to the same extent that it is respecting localities that had paid bounties.

"Again, it is contended for the respondent that the substitutes furnished by the plaintiff's assignors did not apply on the quota under the December call. That position assumes that the quota was only what remained after applying the credits derived from enlistments made under the July call. We are confident that construction does not accord with the intention of the legislature. By the word 'quota' is meant the whole number of men assigned to the district, without regard to deductions on account of credits; the gross quota is meant. The word is manifestly used in that sense in the fourth section, and there is nothing to indicate that it was intended to mean an entirely different thing in the sixth section. Judge BARKER laid much stress upon the suggestion that the construction contended for by the plaintiff gives an enrolled man who furnished a substitute under the July call a bounty, while none is given to a volunteer who enlisted at the same time and for the same length

of service, although his enlistment applied on the quota under the December call. There was a very good reason for not giving the bounty provided by the act to one who had volunteered before the act was passed. We may take judicial notice of the additional fact that, for a long time before the passage of the act of 1865, localities and individuals had competed with each other, and paid extravagant prices for men to enlist,—an evil which the act was designed to remedy,—and that, while such competition prevailed, there was no volunteering without a bounty being paid, generally much larger than that given by the act. This fact is a part of the public history of that eventful period. During the same session of the legislature in which the act under consideration was adopted, numerous statutes were passed legalizing the action of town and county officers in issuing bonds to provide bounties for volunteers credited on the quota under the July call. There was therefore not only no occasion to provide for those who had volunteered before the act was passed, and whose excess of years of enlistment went to reduce the December quota, but to have done so would have broken in upon the policy of uniformity of bounties, and would have secured to those so favored a large excess of bounty over that provided for subsequent volunteers. For that reason the provision giving bounties to volunteers was made prospective only. But, although wholly prospective, not every person subsequently enlisting was entitled to the bounty. The act provided that no bounty should be paid to a volunteer, substitute, or drafted man subsequently entering the service who should go to fill any quota, or a deficiency of any quota, under any call prior to that of December, 1864. Section 2. However, the latter provision was not intended to cut off the bounty which a subsequent volunteer would be entitled to for an excess of years applied on the December quota, although he may have enlisted to fill the July quota. In fine, the policy of the act, pervading its various provisions, was to give uniform bounties to volunteers, and to enrolled men furnishing substitutes, going to reduce the quota under the December call, whether before or after that call was issued, except that volunteers who had enlisted before that time, being regarded as having already received a bounty in amount equal, at least, to that awarded by the act, were not given the latter bounty. By a later act passed at the same session, the sixth section was so amended as to extend the uniform bounty to any drafted man entering the service, or furnishing a substitute, to apply on the quota under the December call. Chapter 226. To carry out more fully the policy of making bounties uniform, the bounty given to an enrolled man was fixed at a certain sum, regardless of the amount paid by him to his substitute. It was well known that the price of substitutes at all times after the July call was quite as large as the bounty given by the act. So, too, towns and other localities were to be reimbursed the bounties paid by them, not exceeding the same fixed sum. And not only was the amount of the bounty made uniform, but those who had helped to fill the quota under the December call, before the act was passed, were put upon an equality with those who should contribute to the same end thereafter. The sixth section is in entire harmony with the general policy of the act thus interpreted. An analysis of its provisions shows that a person, in order to be entitled to the bounty given, must first, either have previously furnished, or thereafter furnish, an acceptable substitute to apply on the quota under the December call; and as the substitute, although acceptable, might not in fact be accepted, an acceptance of such substitute by the United States authorities was made the second requisite; and since the substitute might be credited to some other locality, it was required, thirdly, that he be credited to the town, city, or county in which the person furnishing him was enrolled; and finally, as, although furnished to apply on the quota under the December call, and accepted as a substitute, and credited to the proper locality, he might be in fact applied to the reduction of some other quota, it was further required that he must go to reduce the De

cember quota of the proper locality. Each of those requisites was designed to effectuate the policy of the act, and to guard against an abuse of its provisions, and each was essential to that end. If our interpretation of the statute is correct, all the requisites of the sixth section concurred in the case of each of the plaintiff's assignors, and they were entitled to a bounty of four hundred dollars each under the act.

"That the bounty money to which the assignors were entitled was paid to the committee of the board by the paymaster of the state can hardly be questioned. The whole excess of years of service of the July enlistment applied on the December quota of Erie county, and allowed by the state, was 2,408 years, and the sum paid to the committee by the state on account of it was $481,600. The evidence tends to show that this sum included the claims made by the assignors, amounting to $80,800. An examination of the tabular statement, already referred to, annexed to the certificate of the provost-marshal, shows that the 2,408 years above mentioned are the total number of years of bounty earning excess in Erie county, exclusive of the old naval credits spoken of in the testimony and of all other one-year credits.

"It appears from the testimony of the paymaster general that for convenience his practice was to settle with and pay over to the counties, without regard to whether or not any part of the money belonged to localities or individuals within the counties, leaving each county to settle with such localities and individuals, and that course he adopted in this instance. The state, in thus paying over the money to the committee, did not undertake to determine whether the county, or localities, or individuals within the county, were entitled to it, or how it should be distributed. In the absence of clear evidence of a contrary intention, it must be presumed that the state officials intended the payment for the benefit of the parties in whom the right to the money resided.

"Nor can it be successfully claimed, in view of the evidence, that in the transaction with the paymaster the agent of the county claimed or understood that he was receiving the money as the property of the county. In his affidavit, which was a part of the vouchers and proofs required by the paymaster in settlement, he was careful not to state that the bounty paid to the men making the excess of twenty-four hundred and eight years was paid by the county. He stated that it was paid, but not by whom. This omission was the more significant, inasmuch as the accompanying affidavits of Messrs. Dart and Goslin, also members of the bounty committee, which related to the payment of bounties paid on the December call from 2d November, 1864, to 30th May, 1865, a period subsequent to the enlisting of the substitutes of the plaintiff's assignors, aver expressly that they were paid by the bounty committee appointed by the board of supervisors of the county. Mr. Young took with him to Albany, for the purpose of the settlement, certificates of the men who constituted the excess, made out in the provost-marshal's office in Buffalo, containing the names of the substitutes and of the principals who furnished them, and including the names of the plaintiff's assignors. Those papers he caused to be prepared for the purpose of the settlement. In short, the evidence tends to show that the agent of the board understood at the time when he received the money that so much of it as purported to be in excess of years of enlistment by substitutes put in by enrolled persons was not paid to the county by way of refunding or otherwise, but was put into the hands of the county to distribute it among the parties to whom it belonged, and for that purpose he received it. The action of the agent in that respect was the action of the board and of the county, and the latter could not defeat the rights of the parties entitled to the money by subsequently claiming to have received it as its own. Since the receipt of the money the board has paid out portions of it to individuals, as bounties for substitutes furnished by them, and going to make up the excess allowed on the settlement, showing conclu-

sively that they did not claim to hold the entire sum paid them as the money of the county. It does not appear that they have paid the plaintiff or his assignors. If they have, it is matter of defense. As the case now stands, the county appears to have received from the state money belonging to the plaintiff's assignors, upon the understanding, if not the express promise, that it would pay it over to the persons entitled to it.

"The question remains whether that state of facts gives the plaintiff a right of action against the county. It was held in *Bigelow* v. *Davis*, 16 Barb. 561, cited by defendant's counsel, that, in case of a mere agency for the transmission of money, the party for whom the money was designed cannot maintain an action against the agent for money had and received to his use. To sustain an action, there must be an express promise by the agent. The facts of the case were that one Chase, a debtor of the plaintiff's intestate, handed to the defendant sixty-five dollars, and requested him to hand it to the intestate, and have him give Chase credit for it, and the defendant said he would do so, and took the money. Mr. Justice ALLEN, who delivered the opinion of the court, said: 'It may be doubted whether the law will imply a promise to one person upon a consideration moving entirely from another, and where there is no proving of contract or dealing between the parties. The plaintiff relies upon the naked fact of the delivery of the money to the defendant, to be by him delivered to the plaintiff's intestate. The money remained the property of Chase, the debtor.' These remarks present the distinction between that case and this: Here there were dealings between the county and the assignors. Both had been engaged in the common purpose of filling the quota, and the county assumed to present the claim of the assignors to the state, in connection with its own, and to receive the money which was paid over by the paymaster, in accordance with his practice, and, it is to be presumed, in accordance with the regulations prescribed by the governor, (section 6 of the act,) nothing appearing to the contrary. The board of supervisors entered into the arrangement, and became the recipients of the money, not as the agent of the state, but *sua sponte* and for its own purposes. This appears from a report made to the board by Mr. Young, the chairman of the special committee appointed to attend to the interests of the county in all matters relating to the state bounty law, made on the 26th April, 1863, and a resolution adopted pursuant to its recommendation several weeks previous to the settlement with the state. The report stated, among other things, 'that citizens of several of the towns and wards in this county have by subscription and loans raised money and paid local bounties to recruits credited on the quotas of said localities under the call of December, 1864; and, the present acting bounty committee having advanced to such volunteers only a portion of the bounty allowed by the state, it becomes necessary that the amount so advanced by citizens be refunded to them; and for the purpose of collecting from the state all such moneys paid by the bounty committee and by citizens, as before stated, this committee will have to include in their account to, and settlement with, the state authorities, all such claims; * * * and as the state bonds are issued in amounts of $1,000 each, and many of those claims are for less amounts than $1,000 and for fractional amounts, and others will have to be paid in cash, it will become necessary to negotiate a portion of said state bonds: Now, therefore, resolved [among other things] that this committee is hereby authorized to settle such claims, and draw upon the county treasurer for such amounts as may be necessary to pay the same.' The resolution constituted, in part, at least, the authority under which the agent of the board acted, and it shows that, so far as the settlement of claims of individuals was concerned, he and the board assumed to act as the agents of the claimants and not of the state. The *Case of Bigelow* is not applicable. The plaintiff, as assignee, having ratified the action of the board by bringing suit for the money, the transaction is to be regarded as a payment of his claim on the part of the state, and the county must be deemed to hold the money as the

agent of the parties for whom the board assumed to act. The county having received the money as the property of the plaintiff's assignors, for the purpose of paying it over to them, under the circumstances above stated, it may well be doubted whether the defendants can now be heard to dispute the title of the plaintiff's assignors; but we have preferred not to rest the case on that ground, and, treating the question as an open one, to examine it on its merits.

"The result of these views is that the order appealed from should be reversed, and a new trial granted, and as what we have said indicates the proper line of evidence to establish the plaintiff's case, as we conceive it to be, we do not deem it needful to discuss the numerous exceptions taken to rulings excluding testimony offered by the plaintiff, further than to say that we regard evidence of what was said and done by and between the agent of the board and the paymaster general, at the time of the settlement, concerning the business in hand, including all papers then and there produced by the agent for the purpose of such settlement, and what was said and done respecting them, as a part of the *res gestœ*, and therefore admissible. Order reversed and new trial granted, costs to abide event. TALCOTT, P. J., and HARDIN, J., concur. So ordered."

A new trial was had, and an appeal from an order of the special term denying plaintiff's motion for a new trial upon a case containing exceptions, and also from an order of the same court denying a motion for the like relief upon affidavits. The following opinion was handed down by the general term in April, 1884:

"SMITH, P. J. This action is brought to recover state bounty money alleged to have been received by the defendant for the use of the plaintiff's assignors,—two hundred and two in number. The plaintiff claims that each of said assignors furnished a substitute in the army of the United States, who was credited on the quota of the county of Erie, under the call of 19th December, 1864, for which he was entitled to a bounty of four hundred dollars under the provisions of chapter 29 of the Laws of 1865, and that said bounty has been paid by the state to the defendant for the use of such assignor. The case was before us on a former appeal, on which occasion we set aside a nonsuit that had been ordered on grounds denying the right of said assignors to bounties under the act referred to, and granted a new trial, holding that the plaintiff had made out a *prima facie* case to the whole amount of his claim. The defendant's answer set up, among other defenses, that it paid for every substitute mustered into the service and credited to its quota, in the years 1864 and 1865, the sum of six hundred dollars each to the persons furnishing said substitutes, respectively, which was the county bounty then being paid for volunteers by said defendant. At the trial now under review the learned judge who presided denied the defendant's motion for a nonsuit, and submitted the case to the jury upon the single question whether the defendant had paid the plaintiff's assignors, as alleged in the answer. The jury having found for the defendant, the plaintiff's counsel contends that the verdict is without evidence. A careful view of the somewhat voluminous testimony has led us to the conclusion that his contention is well founded.

"In order to see the bearing of the portions of the testimony which the defendant claims tend to support the verdict, it will be useful to refer briefly to some of the provisions of the act, and certain facts in the case which are undisputed. The act provided that the bounties to be paid pursuant to its provisions should not exceed $600 upon an enlistment for three years, $400 for two years, and $300 for one year. The second section provided for the payment of bounties to volunteers, and the sixth section for a like bounty to a person furnishing a substitute credited to the town, city, or county in which said person was enrolled, and going to reduce the quota in such town, city, or county under the call of the 19th of December, 1864. But the last-mentioned section provided that, 'if any such person has received any sum from

any city, county, or town, he shall receive, by virtue hereof, no more than· enough to make the amount to be paid to him equal to the bounty hereby provided for.'  On 18th July, 1864, the president of the United States issued a proclamation calling for 500,000 volunteers, for one, two, or three years, as they might elect, and ordering that, immediately after 5th September, 1864, a draft for troops to serve one year be had in every town, township, ward of a city, precinct, or election district, or county not so subdivided, to fill its quota under said call, or any part thereof, which might be unfilled by volun·· teers on the day last named.  Enlistments for more than one year, applicable· on the quota under that call, gave an excess, and any term of enlistment after the July quota was full gave an excess, and the excess in each case was applicable upon the quota under the December call.  Enlistments in Erie county were carried on from June, 1864, to the following January.  The quota for that county, under the July call, was 3,004, and it was filled by volunteer recruits and substitutes prior to draft.  After filling that quota, there was an excess of 2,408 years of enlistment, which excess was allowed to the county upon its quota under the December call, in its settlement with the state, and on account of which it received from the state the sum of $481,600.  The substitutes furnished by the plaintiff's assignors were put in from June 23d to September 9th inclusive, and they were included in the lists which went to make up said excess, and were used upon the settlement with the state. The excess settlement was made 6th July, 1865, by Mr. Charles E. Young, of the board of supervisors, representing the county, and Paymaster General. Marvin, representing the state.  Out of the sum so received by the county on the excess settlement it refunded to towns, wards, and individuals the sum of $223,301.50, and no more, so far as the proof shows, but no part of that sum was refunded or paid to the plaintiff or his assignors.  The balance of the sum so received by the county appears to have been used by it in paying its outstanding bonds.  The theory of the defense, as we understand it, is that the county paid the bounty to the plaintiff's assignors when they respectively put in their substitutes, either by paying the money directly to the principal or to the substitute on account of the principal.

"Now, as to the evidence of payment of the claim in suit.  No witness was called by the defendant.  A large part of the proof is documentary, consisting, to some extent, of the proceedings of the board of supervisors, and of reports made to it by the committee having the bounty matters in charge; but we have not been referred to, and have not been able to find among the papers in evidence, any report, resolution, voucher, or other writing that can be regarded as proof that the county ever paid the bounties in question to the plaintiff's assignors, or to any one for their use.  No receipt from the assignors, or either of them, is shown.  No witness testifies to payment, or to an admission of payment.  The defendant put in evidence a paper marked 'Exhibit N,' purporting to be a statement of the number of men to whom· bounties were paid by the county of Erie from 1st September, 1864, to 1st January, 1865, and which Mr. Young identified as one of the papers used in the excess settlement.  As the paper was prepared by the agents of the defendant, it is not evidence against the plaintiff, and, if it were, it does not purport to show payment to plaintiff's assignors.  They are not named in it, and their substitutes, with but few exceptions, were put in before the 1st of September.  And the total sum appearing by that statement to have been paid as bounties was only $654,043, while the county received from the state the sum of $978,563, as reported by the bounty committee in October, 1865. The only testimony upon which the verdict can be said to rest is the fact that in the affidavit which Mr. Young made on the settlement he deposed that 'the men making said excess were paid a sum as bounty equal to $200 per year,' without stating by whom the payment was made; and the testimony of Gen. Marvin that if Mr. Young had stated to him or produced proof to him to show that he was claiming pay on behalf of principals. for substitutes.

put in by them, he would not have paid him anything on their account. The bare statement of this testimony shows that it was *res inter alios acta,* in no way affecting the plaintiff's assignors, who had no agency in or knowledge of the transaction to which it relates. We turn to the brief of the learned counsel for the respondent, to see what use he makes of the testimony referred to, and we find he argues to this effect, namely, that the agents of the county, who prepared the papers used in the excess settlement, knew so well that the state did not and would not allow the county for claims of individuals furnishing substitutes, which had not been paid by the county, that before the jury could find that in the settlement claims of that kind were presented by the agents of the county, and paid to them, they must convict such agents of the crime of obtaining $80,000 by false representations, and of perjury.

"A brief examination of the evidence will show that a verdict for the plaintiff would have involved no such conclusion, for several reasons:

"(1) The affidavit referred to was drawn, not by Mr. Young or any agent of the county, but by the paymaster general. He used a blank for the purpose, in which he made several alterations, evidently for the purpose of adapting it to the case. The blank affidavit as printed was designed to be sworn to by two or more persons, describing themselves therein as ' the representatives and accredited agents of the county,' and alleging that they ' have had sole charge of the payment of local bounties for said county on the call of December 19, 1864; that the persons named in the annexed lists were enlisted and credited to the said county; and that they have paid to such recruits and substitutes, personally and severally, the sums set opposite their respective names as bounty.' The blank was so altered and filled up so as to make it an affidavit to be sworn to by Mr. Young alone. It averred that he was the representative and accredited agent of the county; that he had had sole charge of the payment of local bounties for said county. The reference to an ' annexed list,' and the averment that the affiant had paid the men, were struck out, and the affidavit was made to read ' that the persons making 2,408 years' excess were enlisted and credited to the same county on the quota under call December 19, 1864, and reduced the quota to the extent credited, and that the men making said excess were paid a sum as bounty,' etc., without saying by whom paid. Both Gen. Marvin and Mr. Young testified that they had no recollection that at the time of the settlement Mr. Young said who made the payment. In the recruit settlement, made about a month previously, the affidavit made by the agent of the county stated that the men were paid by the county. In all this there is no evidence of perjury or false representation on the part of Mr. Young. The affidavit is entirely consistent with the plaintiff's claim that the bounties had been paid by his assignors, and not by the county, and there is no evidence that Mr. Young made any representation to the contrary.

"(2) The board of supervisors and their bounty committee understood that the state would allow the claims of individuals for bounties paid by them, and not by the county, for substitutes put in to reduce the quota of the county on the December call. This is shown by the report made by the bounty committee to the board, and adopted by the latter 26th April, 1865, in which the necessity of including individual claims with those of the county for the purpose of settling with the state was set forth, and authority was given to the committee to do so, and to settle with the state on that basis. And a report made by the committee to the board in November shows that claims of individuals were included with those of the county in the settlement with the state. If it be suggested that the proceedings in April referred only to the claims of citizens who had raised money by subscriptions and loans and paid counties to recruits, it may be answered that the board and its committee, by their subsequent action in regard to the excess settlement, regarded the plaintiff's assignors as within the rule adopted by those proceedings.

"(3) It is evident from the testimony of Gen. Marvin that his reason for

declining to pay directly to individuals, and requiring their claims to be presented by and settled with the county, was mainly a matter of convenience. He paid in large sums, as he expressed it. He gave no direction and took no responsibility as to the distribution of the money. If it was his general practice not to advance money to a county on account of the claims of individuals, which it had not previously paid, that practice was departed from by him in the case of the recruit settlement in Erie county, as we have seen, and by the local agents of the state, who, instead of himself, paid claims in the counties of New York and Kings. Mr. Young had reason to suppose, from Gen. Marvin's action in this respect, in the recruit settlement, that such action would be followed in the excess settlement, and the accounts were prepared accordingly. Upon either of the grounds above stated, the action of Mr. Young and of the other agents of the county may be accounted for, without imputing to them either of the crimes suggested by the counsel. The form of the affidavit indicates very strongly that Mr. Young was aware that the bounties had not been paid by the county, and that he was careful not to state to the contrary, so that, if any inference is to be drawn from it as to the fact of payment by the county, it is adverse to the defense. The affidavit also indicates that Mr. Young and Gen. Marvin intended that it should be so drawn as that, while stating the material fact of payment, it should not state by whom the payment was made. But whatever inferences may be drawn from the transactions between Mr. Young and the paymaster general, and whatever either of them may have intended, those considerations do not touch the question whether the county had in fact paid the plaintiff's assignors. Mr. Young testified at the trial that he had no knowledge whether the county had paid the plaintiff's assignors or not. If the fact existed, he would have been as likely to know it as any one, in view of his statement in his affidavit that he had had sole charge of the payment of local bounties for the county. Gen. Marvin had no knowledge of the transactions between the defendant and the plaintiff's assignors, and did not profess to have. So that the verdict of payment rests upon an affidavit by which the plaintiff is in no way affected, and the only inference from which is that the defendant had not paid, and the testimony of two witnesses, neither of whom had, or professed to have, any knowledge as to the fact in dispute.

"The only other consideration suggested by the counsel in his brief to sustain the verdict is that the several assignments of the claims in suit, taken by the plaintiff, do not show what sum each assignor paid to his substitute, and do not state that the county had not paid the bounty to him or his substitute. What bearing those circumstances have on the issue submitted to the jury it is difficult to conceive, and we dismiss them with the statement of them. But the fact that they are gravely urged by counsel suggests the probability that some such irrelevant consideration had weight with the jury, and produced the verdict. Not only was there no evidence of payment, but the plaintiff took the pains to put one of his assignors on the stand, and to make affirmative proof by him that his claim had not been paid. That we have not misapprehended the views of the trial judge as to the evidence upon which the question of payment was to be decided by the jury is apparent from his opinion delivered at the special term on denying a new trial. In that opinion he says it appears to him 'that the affidavit of Mr. Young, upon which the paymaster general made the payments, and the testimony of the paymaster general that he did not intend to pay the county for any bounty for any man that it had not put in and paid already for,' was sufficient to carry the case to the jury. No other reason for denying a new trial is given in the opinion. Some other circumstances were adverted to by the judge in his charge, as confirmatory of the construction which the defendant contended should be given to the affidavit of Mr. Young, but it was not claimed that they were sufficient of themselves to support a verdict for the defendant, and they are not referred to in the opinion of the judge at special term, or in the brief of the defend-

-ant's counsel.   If the views above stated by us are correct, it follows that the verdict is without evidence, and that the learned judge erred in refusing the ·plaintiff's request to direct a verdict in his favor.   The foregoing considera- -tions render it unnecessary to examine the numerous exceptions taken to rul- ings upon questions of evidence and the order denying the applicat on for a ·new trial on affidavits.   As, however, we reverse the order denying a new ·trial on the merits, the latter order also should be set aside.   Orders appealed from reversed, and a new trial granted, costs to abide event.   HARDIN, J., ·concurs.   BARKER, J., not voting.   So ordered."

The next trial resulted in a verdict for defendant, and on appeal from an order denying a motion to set aside the verdict, and to grant a new trial, the ·order of the special term was, in June, 1889, reversed, on the ground that the verdict was not sustained by the evidence, and a new trial was ordered. . 6 N. Y. Supp. 91.   On the next trial a verdict was directed for plaintiff.   Defend- -ant appeals.

Argued before DWIGHT, P. J., and MACOMBER and CORLETT, JJ.

*Wm. B. Hoyt,* for appellant.   *Frederick Almy,* for respondent.

PER CURIAM.   Judgment affirmed upon the opinions of the general term, in January, 1881, April, 1884, and June, 1889.

CORLETT, J., (*dissenting.*)   This action was brought to recover for mon- eys alleged to have been received by the defendant for the plaintiff's assign- -ors.   A trial was had in May, 1890, before a justice and jury.   At the close of the evidence a verdict was directed in favor of the plaintiff for $211,851.59, ·being $400 each for 201 men, and interest, amounting to $131,451.59.   During the progress of the civil war, which commenced in 1861, and terminated in 1865, various proclamations were issued by the president to replenish and in- -crease the army, among which was one in July, 1864, for 500,000 men, and another in December following for 300,000 men.   In the pressure and exi- gencies of the conflict, various expedients were resorted to by towns and municipalities to secure their proportionate number of soldiers.   As an in- -ducement, the county of Erie, early in 1864, offered a bounty for each sol- dier.   The case shows that the amount of the bounty was left to a committee which was appointed, and that the amount paid was from $200 per year up to -$600 for three years.   The terms of enlistment before the July call were ·three years, and after that from one to three.   Many patriotic citizens, not liable to military duty, and who were not enrolled, furnished soldiers to aid the government.   The courts will take judicial notice of public events which ·occurred during the progress of the war.   This was well stated by Justice SMITH in his first opinion.   Before chapter 29 of the Laws of 1865, no bounty ·was offered by the state for recruits, volunteers, or soldiers.   The first six :sections of that act are as follows:

"Section 1. For the purpose of filling the quota of men required for the ·army and navy of the United States from this state, under the last call of the president, dated December nineteenth, eighteen hundred and sixty-four, and also under any future call or calls which may be made during the present war, a state bounty shall be paid to volunteers furnished from this state as in this act is provided.

"Sec. 2. Such bounty shall be paid to so many volunteers furnished from the several towns and cities of this state as shall be necessary to fill the quota ·of said towns and cities, respectively; fixed by the authorities of the govern- ment of the United States under said call or calls: provided, that no bounty shall be paid to any volunteer until he shall have been enlisted and have been accepted and credited upon the quota of the town or city from which he shall en- list, by the authorities of the United States: and provided, also, that said bounty shall only be paid to non-commissioned officers, musicians, and privates enlist- ing in the armies of the United States, and to persons enlisting in the navy there- of, and who shall be credited by the authorities of the United States upon the quotas of the towns or cities in this state from which they shall enlist under

said call or calls: and provided, also, that no such bounty shall be paid to any volunteer, substitute, or drafted man who shall volunteer, be substituted, or be drafted to fill up any quota, or to fill up any deficiency of any quota, of any city, county, or town, arising upon any call for men made before the nineteenth day of December, A. D. eighteen hundred and sixty-four; and where, before the passage of this act, any town, city, or county, by means of local bounties, raised and paid under said chapter eight of the Laws of eighteen hundred sixty-four, shall have filled its quota, or any part thereof, required by the call of December nineteenth, eighteen hundred sixty-four, or shall have furnished an excess of men or of years of service under the call of July eighteenth, eighteen hundred sixty-four, by furnishing men for one or more years, who, being or having been credited before or since said call of December nineteenth, eighteen hundred sixty-four, to said town, city, or county, shall have operated to relieve, in whole or in part, said town, city, or county, from furnishing men under the call of December nineteenth, eighteen hundred sixty-four, the bounties so raised and paid, not exceeding the rates and sums mentioned in this act, shall be refunded from the moneys to be obtained, or by the bonds to be issued under the provisions of this act; or, in case the said moneys and the said bonds shall be insufficient for the purposes of this act, by the comptroller giving credit therefor to the several cities, counties, or towns by which the said bounties have been so raised or paid; and where there shall arise any difference or dispute as to the amount of money that ought to be refunded or credited to any county, city, or town, or as to any question in reference thereto, the same shall be adjusted and determined by the governor, comptroller, and attorney general, who shall be a board for the purpose.

"Sec. 3. There shall be paid to each volunteer aforesaid a sum not exceeding the sum of six hundred dollars if he enlists for three years; four hundred dollars if he enlists for two years; and three hundred dollars if he enlists for one year; and there shall also be paid to each drafted man who shall be actually mustered into the military or naval service of the United States the sum of two hundred and fifty dollars; and, to enable the authorities of the state to pay the same, the comptroller is hereby authorized to borrow, on the credit of the general fund, from any of the funds in the treasury, sufficient moneys to carry out the provisions of this act, or in any other manner to borrow the same, and to repay the sum so borrowed from the money to be raised under and in pursuance of the provisions of this act.

"Sec. 4. No city, county, or town shall hereafter borrow or raise by tax any money, or authorize the borrowing or raising by tax of any money, for the purpose of paying bounties to volunteers, drafted men, or substitutes, under the said call, dated nineteenth December, eighteen hundred and sixty-four, or any future call, otherwise than is provided in section seven of this act, and not to exceed one hundred dollars for hand money and incidental expenses, for procuring each volunteer; nor shall any city, county, or town, or any individual or any individuals, pay any money for such purpose or purposes, otherwise than is hereby provided, (except that an individual may in any way way hire a substitute to exempt himself from draft;) but nothing in this act shall be so construed as to affect or invalidate any expenditures hitherto made, or any obligations already incurred, or the levying of any tax for the discharge of such expenditures or obligations; and every act, proceeding, or resolution of any board of supervisors, or of the common council of any city, or of any board of town officers, or of any officer of any county, city, or town, in contravention of the provisions of this section, shall be void.

"Sec. 5. The bounties provided in this act shall only be paid to the volunteers in person, or in such manner and at such time or times as shall be directed by the governor, as commander in chief, in general orders. Any agreement, by any volunteer or substitute, with any broker, or any middleman, or any agent, acting between him and the authorities of any city, county, or town for the payment of any part of the bounty to be paid to him

by the provisions of this act, to any other person, whether executed or not, is hereby declared to be void; and such volunteer or substitute, his heirs, personal representatives, or assigns, may, at any time within four years, recover any money paid or received in violation of this act, with interest from the time of such payment or receipt, from the person or persons to or for whom such money is paid or received; and, in an action for the recovery of money so paid or received, the defendant may be arrested as provided in sections one hundred and seventy-nine and one hundred and eighty-one of the Code of Procedure, and the judgment recovered in any such action may be collected by execution against the person of the defendant, as provided in section two hundred and eighty-eight of the Code of Procedure.

"Sec. 6. A bounty, to the amount hereinbefore provided, shall be paid to any person who has furnished, or who shall furnish, an acceptable substitute, to apply on the quota on the call of December nineteenth, A. D. eighteen hundred sixty-four, which substitute shall have been accepted by the authorities of the United States, and credited to the town, city, or county in which said person shall be enrolled, and which substitute shall go to reduce the quota in such town, city, or county, which bounty shall be paid under such regulations as shall be prescribed by the governor, as commander in chief, by general orders. But, if any such person has received any sum from any city, county, or town, he shall receive, by virtue hereof, no more than enough to make the amount to be paid to him equal to the bounty hereby provided for."

The other sections have no application to the case at bar. Section 6 was amended by chapter 226 of the same year. The amendment simply extended the section above quoted to drafted men.

The plaintiff claims that 201 of his assignors were entitled, upon the facts appearing in this case, to recover $400 each, with interest, and it was for this amount that the trial court directed a verdict.

Charles E. Young, one of the supervisors of the county of Erie, and its alleged agent, in the summer of 1865, secured from the state, in all, $978,563, of which $482,200 was obtained under the settlement of the 6th of July, 1865. The controlling paper used on the July settlement, which related to excess of years, was Young's affidavit, of which the following is a copy:

"State of New York, City and County of Albany—ss.: On this *sixth* day of *July*, A. D. one thousand eight hundred and sixty-five, before me, the undersigned, a *commissioner of deeds*, duly authorized by law to administer oaths within and for the county aforesaid, personally appeared *Charles E. Young*, who, being duly and ~~severally~~ sworn, deposes and says that *he is* ~~they are~~ the representative ~~s and~~ accredited agent ~~s~~ of the county of *Erie*, state of New York, and has had sole charge of the payment of local bounties for said *county* on the call of ~~December 19th~~ *July 18th*, 1864; that the persons ~~named in the annexed list were~~ *making twenty-four hundred eight years' excess were* enlisted and credited to the said *county on the quota under call Dec. 19, 1864, and reduced the quota to the extent credited, and that the men making said excess were paid a sum as bounty equal to two hundred dollars per year, and that the one hundred and thirty-three men on former calls were mustered between July 1st and July 18, 1864,* ~~and that they have paid to such recruits and substitutes* personally and severally the sums set opposite their respective names as bounty~~, for which sums they do now claim, on behalf of said *county*, reimbursement from the state of New York, under the provisions of chap. 29, Laws of 1865.    C. E. YOUNG.

"Subscribed and sworn to before me this 6th day of *July*, 1865.

"[5 c. Stamp.]    GEORGE P. TEN BROECK, Commissioner of Deeds.

"*To be changed, if necessary, to conform to mode of payment."

This affidavit was drawn upon a printed blank, and the changes in the blank indicated by italics were written by Selden E. Marvin, the paymaster general of the state. The erasures in the copy were also made by him. The other papers used on the excess settlement were Exhibits B 2, B 3, 16 to 22,

and defendant's Exhibit B 7, which were made by Gen. Scroggs and Maj. Hayman from records in their offices; also plaintiff's Exhibits 24, 25, and 26; and also defendant's Exhibit B 6,—none of which were signed by any one. The rest of the moneys were obtained on other settlements, not involved in this case.

The defendant contends that a recovery was allowed for 37 men enlisted in the naval service whose names were not officially before the paymaster general or considered on the settlement, and on account of whom nothing had been paid. The defendant also claims that all the persons on account of whom the plaintiff recovered went into the army before December 19, 1864. The defendant also claims that 14 men on account of whom the plaintiff recovered were mustered into the service before the 1st day of July, 1864. The defendant also insists that 9 men, on account of whom recoveries were allowed, were neither enrolled nor liable to perform military duty. The defendant further claims that the evidence shows that 4 of the men on account of whom recoveries were had, had been previously paid not less than $300 each. The defendant also claims that the men enrolled in the army before the 18th of July, 1864, did not reduce the December quota, but the July quota.

This action was commenced in 1871, and was tried before Justice BARKER and a jury. The result was a nonsuit. An application for a new trial by the plaintiff was denied by the trial justice, upon the ground that the plaintiff's assignors were not entitled to the state bounty. On appeal to this court, a new trial was granted, for the reason that they were entitled. A new trial was had before a justice and jury, which resulted in a verdict for the defendant, which was set aside by this court, and a new trial granted, for the reason that upon the facts appearing a verdict should have been directed for the plaintiff. Another trial was had before another justice and jury, which also resulted in a verdict for the defendant, which was set aside by this court for the same reason. The trial which presents the questions under review resulted in the direction of a verdict for the plaintiff. Before the commencement of this action one Woodward brought an action on account of one person. A trial was had, which resulted in a nonsuit. The nonsuit in that case was set aside, and another trial was had, which resulted in a verdict for the defendant, after which the case slept.

The complaint in this action alleges, among other things, that the plaintiff's assignors never received from the city, county, or state any sum of money whatever for having furnished a substitute. This allegation is denied by the answer. It thus appears that, before the act of 1865, no substitute, volunteer, or drafted man was entitled to bounty from the state. But the case shows that provision had been made by the county of Erie for the payment of a bounty for each of such men as became a soldier. It is alleged in the complaint that the plaintiff's assignors never received anything from the county or city, notwithstanding the fact that they were entitled to from two to six hundred dollars each. The plaintiff, representing the assignors, claims that he is entitled to the full amount from the state authorized by the act of 1865, unless the defendant proves that his assignors received payment from the city or county. The defendant, on the other hand, insists that before the plaintiff can recover he must prove, in pursuance of his allegations in the complaint, that he received no money from the city or county. In other words, the defendant contends that the plaintiff cannot recover from the state, or out of any moneys paid by it, until he shows that his assignors did not receive the county bounty. The plaintiff, on the other hand, insists that the payment by the county must be proved by the defendant to establish a defense. It is undoubtedly true that the defense of payment is an affirmative one, which the person alleging must prove. It is equally true that, where certain facts must appear to entitle a plaintiff to recover, he must prove them.

If, for example, a contract is alleged, and a recovery depends upon a breach, that fact must be proved to authorize a recovery.

Assuming that the moneys received from the state were for the benefit of the plaintiff's assignors, under a plea of payment, it would be necessary for the defendant to prove that allegation. But the issue here presents an entirely different question, which is whether the plaintiff's assignors received the bounties to which they were entitled from the county. If those bounties were received, then the plaintiff could not recover, and would have no interest in the moneys received from the state. The plaintiff alleges in his complaint that they were not received. He makes no proof tending to establish that proposition. The issue presented is whether, upon this branch of the case, the affirmative rests upon the plaintiff or defendant. In order to enable the plaintiff to recover any part of the state moneys, it must appear that he is entitled to receive them, which he would not be if he obtained the bounty moneys to which he was entitled from the county. It is fair to presume that the moneys which the county promised to pay were paid to the persons entitled to receive them, in the absence of proof to the contrary. It was a condition precedent to the plaintiff's right to recover the state moneys that his assignors should not have received the county bounty. There is no evidence tending to show that the plaintiff's assignors did not receive from the county all the moneys it agreed to pay to secure soldiers. This question does not appear to have been passed upon by this court in any of its former decisions. The complaint alleges that they did not get pay from the county, which is repeated in the case of each assignor. These allegations were denied by the answer. It devolved upon the plaintiff to prove these allegations. 1 Greenl. Ev. § 74; 1 Taylor, Ev. §§ 364, 365.

The receipt or non-receipt of the bounty moneys from the county was peculiarly within the knowledge of the plaintiff's assignors, and the plaintiff, therefore, was in a position to prove, as he alleged, that they never received it. There is no analogy between proving an allegation of payment and establishing an affirmative fact upon which a recovery depends. The non-receipt of the county bounty was the only basis upon which the plaintiff's assignors would have any interest in the state moneys. That was an affirmative fact, alleged by the plaintiff, and denied, which it devolved upon him to prove. *Roberts* v. *Chittenden*, 88 N. Y. 33. That was an action against a carrier for non-delivery of goods. It was held that where the allegation, although a negative one, was put in issue, the burden of proof is upon the plaintiff, and he must give evidence of non-delivery. To the same effect is *Tracy* v. *Tracy*, 12 N. Y. Supp. 665, (decided in this department;) 2 Greenl. Ev. § 213. A cause of action must be proved. *Platt* v. *Railroad Co.*, 108 N. Y. 358, 15 N. E. Rep. 393; *Marks* v. *Townsend*, 97 N. Y. 590; *Austin* v. *Pickler*, 98 N. C. 408, 4 S. E. Rep. 35; *Kahn* v. *Cook*, 22 Ill. App. 559; *Wood* v. *Remick*, 143 Mass. 453, 9 N. E. Rep. 831; *Eastman* v. *Gould*, 63 N. H. 89; *Syms* v. *Vyse*, 2 N. Y. St. Rep. 106.

The question as to whether the plaintiff's assignors, within the statute, are entitled to the state moneys upon the facts appearing on the trials where the question was presented, has been passed upon by this court; but a clear comprehension of the case in all its aspects requires a restatement of the position of the parties upon that question. It is a familiar rule that a statute is never to be construed as having a retrospective effect, without clear language. *McMaster* v. *State*, 103 N. Y. 547, 9 N. E. Rep. 313; *Railroad Co.* v. *Van Horn*, 57 N. Y. 473; *Benton* v. *Wickwire*, 54 N. Y. 226; *Carpenter* v. *Shimer* 24 Hun, 464. This court, in construing the statute of 1865, so held. There was no law authorizing any person who enlisted, volunteered, or was drafted to receive any bounty from the state until after the passage of that act. It is obvious, therefore, that the bounties it created could have no application to the plaintiff's assignors, except as expressly en-

acted.  As an original question, it is difficult to see how the act applied to those who enlisted before the December call.  Justice BARKER fully considers that aspect of the case in his opinion denying a new trial.  The settlement with the state was made on that assumption.  Young states, among other things, in his affidavit, that he had sole charge of the payment of local bounties for said county on the call of July 18, 1864, and that the men enlisted were paid a bounty equal to $200 per year.  This sum called "bounty" must have been money paid by the county.  Money paid by a principal to a substitute or volunteer would not be called "bounty."  It would be a forced construction to hold that this bounty was paid by anybody except the county.  In addition to this, the affiant Young further states, "for which sums they do now claim, on behalf of said county, reimbursment from the state of New York."  Young spoke on behalf of the county which he represented.  Aside from this, the evidence outside of the affidavit tends to show that the county had paid for troops more than $1,400,000 for bounties, while the whole amount received from the state on the different settlements was only $978,563.  In addition to that, none of the plaintiff's assignors, so far as appears, requested Young or the county of Erie to make the settlement with the state for their benefit; nor does it appear that any of them knew that efforts were being made in that direction, or that any settlement was had for their benefit.  He assumed to represent the county of Erie, and his purpose was to get money from the state to reimburse the county for expenditures made.  The county bounty of $600 was intended for three-years' men.  He therefore states in his affidavit that they received at the rate of $200 per year, in the form of bounties.

All the juries before whom the case has been tried found, when the question was submitted to them, that Young acted for the county of Erie, and received the money to reimburse it for expenditures actually made, and not for the benefit of the plaintiff's assignors.  The whole case on its face shows that the claim on the part of the plaintiff's assignors to obtain this money was an after-thought, and the invention of active speculators, who procured assignments without, so far as appears, the request of any of the assignors, for the purpose of obtaining and dividing profits.  It was clearly a speculative venture on the part of the plaintiff and those who preceded him.  The assignments were not obtained until 1871, and none of them were acknowledged until after the commencement of this action.  It is conceded that one of the purposes for passing the act of 1865 was to reimburse counties and municipalities for moneys actually expended in the shape of bounties to raise troops.  Section 1 simply provides for filling the quota of men under the call of December 19, 1864, and future calls.  Section 2 provides that such bounties shall be paid to, etc.; clearly referring to those put into the army under that call.  Then the act provides that, where bounties had been paid to raise troops, the municipality, in certain cases, should be reimbursed as therein provided.  Section 3 relates to the payment of each volunteer aforesaid—referring to those mentioned in sections 1 and 2—the sums therein named.  Section 4 prevents a town or municipality from borrowing money, except as therein provided.  Section 5 provides that the bounties shall be paid only to the volunteers or persons in such manner as provided by the governor as commander in chief.  This could have no application to local bounties raised by counties or towns, as the governor could have nothing to do with the payment of those.  Section 6 provides for a bounty to a person who shall furnish an acceptable substitute, etc., and credited to the town, city, or county in which said person shall be enrolled, etc.  The whole act proceeds upon the assumption that, before its passage, bounties had been paid by counties, etc., to secure recruits, and one of its purposes was to reimburse the municipalities for such payments.  The act manifestly assumes that all such bounties were paid to those entitled to receive them.  It then makes provision for the payment to men

who enter the service under the December call. Some municipalities had been more vigilant or successful than others, before the call of December, in securing troops. The act was intended to give them the benefit of their success by securing credits and reimbursements to the municipalities for the moneys expended, in the shape of bounties, in replenishing and increasing the army. It intended that, after its passage, the state should assume the expense of paying bounties, and that the practice of raising and paying bounties by towns and counties should be abandoned. The money received from the state, as the affidavit of Young shows, was to reimburse the county for bounties it had theretofore paid. No construction, except a forced and misleading one, could be given to the affidavit on any other basis than that a settlement was made and the money received to reimburse the county for expenditures theretofore made. If, in fact, the county received the moneys from the state on the claim that it had expended the sums received, when in fact it had not, then a gross fraud was perpetrated, and the moneys so obtained should be paid back to the state.

On the trial now under review, 37 recoveries were allowed upon the theory that they were included within the state settlement. The substitutes of assignors upon whose account those recoveries were allowed were enlisted in the navy. There was some evidence upon the trial on the part of the defendant tending to show that those names were not considered or included in the settlement. There was a fair question of fact presented as to whether any of those naval recruits were included in the settlement, or whether any money was paid or received on their account. The learned counsel for the defendant insists that the evidence showing that those names were not included is decisive. The reverse is claimed by the learned counsel for the plaintiff. But all the evidence bearing upon the question indicates that that branch of the case should have been submitted to the jury. It was assumed by this court on the former appeals that those names were included in the settlement. In fact, there was no claim to the contrary. But upon the present trial the facts appeared. The question whether this branch of the case should have been submitted to the jury was never before called to the attention of this court. Fourteen recoveries were allowed on account of men mustered into the service before the 1st day of July, 1864. The learned counsel for the defendant insists that the county of Erie received no money on account of those men, and refers to exhibits in evidence to prove his contention. The evidence on that subject seems, at least, to present a question of fact which should have been submitted to the jury. This was never brought out upon any previous trial, and was never passed upon by this court. Nine causes of action for which recoveries were had were based upon assignors who put in representative recruits. Those assignors were not enrolled, nor were they liable to perform military duty. When the case was formerly before this court, this fact did not appear. In 1861, Justice SMITH, in delivering the opinion of the court, says: "Each of the plaintiff's assignors so furnishing a substitute was a resident and citizen of the county of Erie, liable to do military duty under the Laws of the United States. He was properly enrolled in some one of the subdistricts into which the county was divided." On the trial now under review, the plaintiff conceded that seven of the assignors of those causes of action were neither enrolled nor liable to do military duty, and the proof strongly tends to show that the same is true as to the other two. It was not one of the purposes of the legislature to donate money to patriotic men, not liable to perform military duty or enrolled, who saw fit, at their own expense, to aid the government by furnishing soldiers. When they procured recruits, no law existed for paying them any reward or bounty. They did not expect it. No law was afterwards passed to reimburse them for moneys voluntarily expended. The statute only provides for the payment of bounties to persons enrolled and liable to perform military duty. The learned

counsel for the plaintiff insists that the word "enrolled" was surplusage, and that it ought not to be construed as excluding those not enrolled. This contention is obviously untenable. The whole structure of that act shows that it had no application to those not liable to perform military service. It was not the purpose of the legislature to deprive those assignors of the fruits of their honorable acts by donating them money. It would be doing injustice to the state, and to those public-spirited men, to assume that, after it was all over, the state would repay their voluntary contributions. A recovery for those nine causes of action, at least seven of them, was manifestly erroneous.

There was evidence tending to show that four of the assignors, on account of whom full recoveries were had, were paid from three to six hundred dollars apiece. This should have been submitted to the jury. It is a familiar rule that where the evidence is conflicting, or where different inferences may be drawn from it, questions of fact are presented which must be submitted to the jury. *Thomas* v. *Insurance Co.*, 12 N. Y. St. Rep. 738; *Hubbell* v. *Carpenter*, 5 N. Y. 171; *Smith* v. *Coe*, 55 N. Y. 678; *Crouse* v. *Rowley*, 3 N. Y. Supp. 863; *Stokes* v. *Johnson*, 57 N. Y. 673; *Boos* v. *Insurance Co.*, 4 Hun, 133, affirmed 64 N. Y. 236; *Morss* v. *Sherrill*, 63 Barb. 21. If the county of Erie received the moneys from the state as agent for the plaintiff's assignors, it would be estopped from denying their right to recover. But where one wrongfully obtains money for his own purposes, not for the benefit of another, or as agent for him, he is under no obligations to pay it over to him, but his liability would be to refund to the party from whom he received it. A corporation is not bound by its agents for acts not within their authority. *McCullough* v. *Moss*, 5 Denio, 567. In the case at bar the defendant's position is that the money was not received from the state as agent for any of the assignors. If the money was obtained by the county of Erie as agent for the plaintiff's assignors, interest was properly allowed on the money from the time of its receipt, because it was its duty to pay it for the purposes received. If, on the other hand, the county did not receive or hold the money as such agent, but on account of certain equities they had a right to the money, no cause of action would accrue in their favor until after demand. *Sears* v. *Patrick*, 23 Wend. 528; *Bigelow* v. *Davis*, 16 Barb. 561; *Colvin* v. *Holbrook*, 2 N. Y. 126; *Van Hassell* v. *Borden*, 1 Hilt. 128. If the plaintiff's assignors were merely third persons, entitled to the money which the county received, but not as their agent, no recovery could be had until after demand.

There was considerable testimony on the part of the defendant tending to show actual payment. Webster's evidence and Brothers', although not incisive or conclusive, indicate that some, if not all, of the plaintiff's assignors were paid. Other circumstances were proved tending in the same direction. It can hardly be claimed, as matter of law, that the moneys paid by the state, and received by Young, were obtained for the purpose of being paid out to the plaintiff's assignors, or any of them. When, upon the trial now under review, the defendant offered to prove that the moneys were not paid or received for the assignor's benefit, it was excluded, not upon the ground that it was not material, but because of the form in which the evidence was sought, involving, as the plaintiff's counsel insisted, conclusions, and not facts. These were the grounds upon which it was rejected. It was not claimed by the learned counsel on the trial that evidence tending to establish those facts was not competent. It is difficult to see why, under the established rules of law, the evidence tending to show payment, or to prove the purposes for which the money was paid and received, should not have been submitted to the jury. The claim that those questions have been decided against the defendant by previous adjudications does not appear to be well founded. The former new trials were granted, because the evidence in those cases required a certain disposition of the controversy. But that evidence is

not before the court in the case under review. It forms no part of the record. In *Seidenbach* v. *Riley*, 111 N. Y. 560, 19 N. E. Rep. 275, it was held that such proceedings on former new trials, there being no judgment, (as was the case here,) were not *res adjudicata.* As the case now appears before the court, it is difficult to see why it should not have been submitted to the jury on all the controverted questions presented by the evidence. Two aspects are presented. The one is that the plaintiff failed to prove his cause of action as alleged, which was put in issue by the defendant's answer. The other rests upon the assumption that, under the plea of payment, the defendant should have proved payment. On the first proposition, the question did not arise upon the plea of payment, but upon the question whether the plaintiff's assignors received the county bounty, which, as above shown, was an affirmative proposition for the plaintiff to prove. On the second branch there was some evidence of payment. Various exceptions to the admission of evidence were taken by the defendant upon the trial, which need not be considered, as a new trial should be granted for the reasons above assigned.